United States District Court
Southern District of Texas

**ENTERED**

September 28, 2016

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSE PRIMITIVO JAIMES SIERRA, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:15-CV-00640 |
| | § | |
| NASLY XIMENA RIASCOS TAPASCO, | § | |
| | § | |
| Respondent. | § | |

## OPINION AND ORDER

Pending in the above-referenced international child abduction case is Petitioner Jose Primitivo Jaimes Sierra's ("Jaimes") Petition for the return of his minor daughter under the Hague Convention. Doc. 1. After considering the arguments of the parties, the law, and the evidence presented, the Court finds the petition must be granted for the reasons that follow.

### I. Background

Petitioner and Respondent Nasly Ximena Riascos Tapasco ("Riascos") met in Charlotte, North Carolina in 2006. Tr. 18:23–19:2. Although they never married, they soon moved in together and on July 23, 2009, they had a child, K.J.R. *Id.* at 19:14–25. Both parties were acknowledged as the girl's biological parents on the birth certificate.[1] Pet'r's Ex. 2.

---

[1] Only after Jaimes filed his Hague Petition did Riascos initiate an attack on the paternity of K.J.R. by filing an Original Petition in Suit Affecting the Parent-Child Relationship in the 418th Judicial District of Montgomery County, Texas on July 31, 2016, requesting an adjudication of parentage. (Doc. 16-2.) Notably, however, she testified before this Court that Jaimes was the father of K.J.R. (Tr. 79:10–12.) Only later in her testimony when she admitted that she did not want Jaimes to ever see his daughter again did she say "He's not her father." *Id.* at 109:10–15. When pressed by Petitioner's counsel about what this statement meant, she responded that "the dad is not the person who makes her but the person who raises her, and the one who raised her is sitting in this courtroom. She loves him as her dad, not him, not him who may hurt her, hurt us so much." (*Id.* at 109:17–20.) Although parentage is not at all relevant to the Court's determination in this case, and in fact beyond the Court's jurisdiction, nevertheless, on the record here, the Court concludes that Riascos's arguments that the Court should abstain from a decision in this

Except for periods of separation due to family arguments, Jaimes and Riascos continued to live together with the child after her birth. Tr. 20:16–21:1. In 2011, one of these family arguments grew into a domestic dispute in which the police were called. Although the parties dispute Jaimes's actual guilt,[2] he admits that he pleaded guilty to the charge. *Id.* at 21:15–16.

Jaimes's guilty plea set in motion the chain of events that culminated in this case. Riascos is a Colombian national and Jaimes is a Mexican national. *Id.* at 17:15–16; 30:12–13; Pet'r's Ex. 2. Although Riascos was in the United States on a visa, Jaimes was here illegally. Tr. 18:7–11; 79:22–23. His arrest for domestic violence put him on U.S. Immigration's radar, and he was compelled to appear in immigration court. *Id.* at 21:10–12; 21:24–22:10. He was given the option of departing voluntarily, leaving open the possibility of returning to the United States legally in the future, or being deported. *Id.* at 21:23–22:10. He chose the former. *Id.* at 22:9–10. At this point, both parties admit that Riascos agreed to allow K.J.R. to return to Mexico with Jaimes and executed a notarized travel authorization to this end. *Id.* at 22:21–24:20; 83:5–18. The parties disagree as to whether K.J.R.'s move to Mexico was intended to be temporary or permanent, however. *Compare id.* at 23:2–5, *with id.* at 84:5–8, *and id.* at 110:4–9.

Upon their arrival in Mexico in October 2012, Jaimes and his daughter moved in with his mother for a short time while he secured permanent housing. *Id.* at 28:9–30:2. Two months later, Riascos made her first visit to Mexico. *Id.* at 28:9–30:2; 84:12–13. On this visit, she stayed with Jaimes and K.J.R. between three and four months, first at Jaimes's mother's home, then in the

---

case on the ground that Jaimes is not K.J.R.'s father are deemed not credible. Moreover, the Court notes that by filing suit in state court seeking a parentage determination in her favor, Riascos is doing precisely what the Hague Convention seeks to prevent: forum shopping in child custody disputes. *See Berezowsky v. Ojeda*, 765 F.3d 456, 465 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1531 (2015).

[2] Jaimes alleges that Riascos hit herself with a notebook to make it appear that he assaulted her and that he only pleaded guilty to the charge in order to prevent K.J.R. from being removed from both parents' custody. Tr. 21:5–22; 65:24–66:17.

new apartment Jaimes had secured for the family. *Id.* at 28:9–30:2; 84:15–25.   When she returned to the United States she did not attempt to take K.J.R. with her. *Id.* at 30:20–31:5; 85:5–17.

Riascos's second visit to Mexico occurred in June 2013 when she returned for three days for Jaimes's birthday. *Id.* at 31:16–23; 86:7–10. At the end of this trip, both parties agree that Riascos again went back to the United States without attempting to take K.J.R. *Id.* at 31:24–32:1; *see id.* at 86:7–24. The next month, she returned for 20 days to celebrate K.J.R.'s fourth birthday. *Id.* at 32:2–15; 86:21–87:1. Jaimes testified that Riascos returned to America yet again without asking for or attempting to take the child. *Id.* at 32:13–20. Riascos's account differs. She alleges that she tried to take K.J.R. back with her after this visit but Jaimes put her off by saying they should go to Columbia first to get married. *Id.* at 87:20–88:17.

In December of 2013, the family met in Columbia for one and a half months. *Id.* at 36:5–37:15; 90:10–21. When the trip came to an end, the parties remained unmarried and Riascos again returned to the United States without K.J.R. *Id.* at 37:16–23. In fact, prior to her departure, Riascos executed a second travel authorization allowing Jaimes to return to Mexico with K.J.R. *Id.* at 38:1–5; 90:22–91:19. It is unclear what transpired on this trip,[3] but what is clear is that the relationship between Jaimes and Riascos substantially cooled afterwards. According to Jaimes, this was the last time he saw Riascos. *Id.* at 40:7–9.

In the meantime, in February 2014, Jaimes updated K.J.R.'s immunizations and enrolled

---

[3] Riascos alleges that this visit to her home country was so that they could get married and begin making arrangements to bring K.J.R. back to the United States, but that once they got there she decided that she did not want to marry Jaimes and "that's when everything went wrong . . . and he changed." *Id.* at 88:6–17; 92:18–19. Not surprisingly, Jaimes disputes this version of events, stating that Riascos never asked to take K.J.R. back in either July 2013 or after the family's trip to Columbia. *Id.* at 37:24–25. Instead, he testified that during the Columbian trip he asked if Riascos wanted to return to the United States with K.J.R. but that Riascos declined the offer because she did not have anywhere for the child to live. *Id.* at 38:18–20.

her in school, which was to begin soon after her fifth birthday in the fall of 2014. *Id.* at 33:24 –
35:16; Pet'r's Exs. 1, 11. Also in the months between the family's trip to Colombia and K.J.R.'s
removal from Mexico, Riascos alleges that Jaimes began threatening her and telling her that she
would never see her daughter again. Tr. 92:8–19. She testified that she returned to Mexico in
July 2014 because of these threats and to celebrate K.J.R.'s birthday. *Id.* at 92:8–9; 93:23–25.

At this point, the parties' stories dramatically diverge. Riascos alleges that although she
did not tell Jaimes she was coming to Mexico for K.J.R.'s birthday, she did notify him once she
arrived. *Id.* at 92:2–5. She testified that after her arrival she went to Jaimes's home with his sister
because she was afraid to go alone on account of his recent threats. *Id.* at 93:14–20. When they
arrived, Jaimes allegedly began verbally and physically assaulting Riascos in front of his sister
and daughter, throwing K.J.R. onto the bed during the altercation. *Id.* at 94:2–8.  Riascos testified
that it was only after enduring this abuse and hearing how unhappy her daughter was that she
decided to leave Mexico with K.J.R. immediately. *Id.* at 95:19–96:2.

According to Jaimes, he was not aware that Riascos was in Mexico on the eve of his
daughter's birthday and he never saw her. *Id.* at 50:15–52:16. He testified that his sister had
requested that K.J.R.'s birthday party be held at her house, so he dropped K.J.R. off to stay the
night there and went to do some shopping and prepare for the next day's party. *Id.* at 51:9–52:5.
He slept alone at his home and early the next morning his sister called to tell him that K.J.R. was
gone. *Id.* at 51:20–52:25.  Jaimes immediately notified the authorities who began a search for the
girl, but it was not until November that he received official confirmation that she was residing in
Houston, Texas with Riascos. *Id.* at 53:1–57:25.

On March 11, 2015, Jaimes filed his Verified Complaint and Petition for Return of Child
Pursuant to the Hague Convention and Motion for Temporary Restraining Order and Expedited

Hearing. Docs. 1, 2. The Court timely granted the TRO and set a date for a show cause hearing. Doc. 3. The parties appeared for an initial hearing before this Court on April 30, 2015, and the matter was continued until August 18, 2015. On August 3, 2015, Riascos filed an Emergency Motion to Abate Pending Determination of Parentage, arguing that this Court should decline to adjudicate Jaimes's Hague Convention claims until her recently filed state-court parentage dispute was settled. Doc. 16. On August 11, 2015, the parties' filed a Joint Motion for Continuance indicating that they were in settlement negotiations, which the Court granted on August 14, 2015. Docs. 19, 21.

Riascos resumed her attack on this Court's jurisdiction on the ground that K.J.R.'s parentage was still in dispute with a Motion to Dismiss on Forum Non Conveniens and Alternatively to Abstain on February 10, 2016. Doc. 25. Concluding that the parties had not reached an agreeable settlement, on March 7, 2016, the Court again set the matter for hearing. Doc. 30. The Court subsequently denied Riascos's Motion to Abate Doc. 31 and on May 11, 2016, the parties appeared before this Court for an evidentiary hearing. At the hearing, the Court denied the Motion to Dismiss on Forum Non Conveniens and Alternatively to Abstain Doc. 25 and the parties proceeded with testimony.

## II. Legal Standard

The Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), to which both the United States and Mexico are signatories, "was adopted to address the problem of international child abductions during domestic disputes." *Berezowsky v. Ojeda*, 765 F.3d 456, 465 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1531 (2015) (citations omitted). Recognizing that such abductions are harmful to a child's well-being, 22 U.S.C. § 9001(a)(1), the Convention seeks to prevent parents from "engaging in international forum

shopping and gamesmanship by moving a child to a new country in hopes of obtaining a more favorable custody determination from a different court." *Berezowsky*, 765 F.3d at 465. The Convention's objectives are two-fold: "a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, art. 1, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11. Congress has implemented the Convention through the passage of the International Child Abduction Remedies Act ("ICARA"). 22 U.S.C. §§ 9001–9011.[4]

The central operating feature of the Convention is the return remedy. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). To give this feature effect, ICARA authorizes a person who seeks a child's return to file a petition in state or federal court and instructs that the court "shall decide the case in accordance with the Convention." 22 U.S.C. §§ 9003(a), (b), (d). When the child in question is under the age of 16 and has been "wrongfully removed or retained" within the meaning of Article 3 of the Convention, the child must be promptly returned unless one of the narrow exceptions set forth in the Convention applies. *Id.* § 9001(a)(4); Convention, arts. 4, 12, 13. Accordingly, when evaluating a Convention claim, the Court must limit its inquiry to whether the child was wrongfully removed without straying into an assessment of the merits of the underlying custody dispute. *Berezowsky*, 765 F.3d at 465.

The Convention employs a number of words and phrases as terms of art to guide courts in making a wrongful-removal determination. *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012). A removal is "wrongful" where, under the law of the state of the child's "habitual residence," the child was removed in violation of the "rights of custody" of a person who actually "exercised"

---

[4] Formerly cited as 42 U.S.C. §§ 11601–11610.

those rights at the time of removal. Convention, art. 3; *Abbott*, 560 U.S. at 9. Thus, American courts have recognized that the Convention inquiry consists of three elements: (1) the child was removed from the child's country of habitual residence; (2) the removal was in breach of the petitioner's rights of custody under the laws of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of removal. *Loftis v. Loftis*, 67 F. Supp. 3d 798, 807 (S.D. Tex. 2014) (citing Convention, arts. 3, 12). Under ICARA, the petitioner must establish these three elements by a preponderance of the evidence to make out his prima facie case. 22 U.S.C. § 9003(e).

Once the petitioner has made out a prima facie case, the respondent opposing the child's return has only a few narrow defenses to which to resort.  *See* Convention, arts. 12, 13, 20. A court is not required to order the return of the child if: "(1) the petitioner was not actually exercising custody rights at the time of removal or retention (Article 13a); (2) the petitioner consented to or subsequently acquiesced in the removal or retention (Article 13a); (3) the petition for return was filed more than one year after the date of the removal or retention and the child is now settled in her new environment (Article 12); (4) there is a grave risk that the child's return would 'expose the child to physical or psychological harm or otherwise place the child in an intolerable situation' (Article 13b); or (5) return of the child would violate fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms (Article 20)." *Vazquez v. Estrada*, 3:10-CV-2519-BF, 2011 WL 196164, at *2 (N.D. Tex. Jan. 19, 2011). The first three defenses must be proved by a preponderance of the evidence; the last two by clear and convincing evidence. 22 U.S.C. § 9003(e)(2). The Court may also refuse to return the child if "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention, art. 13.

Even if the respondent establishes one of these narrow defenses, however, the court "has and should use when appropriate" the discretion to order return of the child "if return would further the aims of the Convention." *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996)) (internal quotation marks omitted).

## III. Analysis

### A. Petitioner's prima facie case of wrongful removal

In light of these established principles, to establish his prima facie case, Jaimes must demonstrate that (1) Mexico was K.J.R.'s habitual residence; (2) her removal to the United States was in breach of his legal rights of custody under Mexican law; and (3) he was exercising his rights at the time of the removal. Convention, arts. 3, 13.

#### 1. *Habitual residence*

"Although the term habitual residence appears throughout the various Hague Conventions, none of them defines it." *Larbie*, 690 F.3d at 310 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1071 (9th Cir. 2001)) (internal quotation marks omitted). "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that varies with the circumstances of each case." *Id.* (quoting *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)) (internal quotation marks omitted). The Fifth Circuit mandates that this inquiry begin with the intentions of the parents. *Larbie*, 690 F.3d at 310 (citations omitted); *Berezowsky*, 765 F.3d at 466 (internal citation and quotation marks omitted); *Loftis*, 67 F. Supp. 3d at 808 (citations omitted). Although this approach does not ignore the child's experience, it does give greater weight to the parents' subjective intentions relative to the child's age. *Berezowsky*, 765 F.3d at 466. Consequently, parental intent is dispositive when the child is "so young that he or she cannot possibly decide the issue of residency." *Id.* (internal citation and quotation marks

omitted).

The threshold question in these determinations is whether both parents intended for the child to abandon the habitual residence left behind. *Id.* (citation omitted). In difficult situations such as this, where parents disagree as to the place of the child's habitual residence, the court must look to the last time the parents' intentions were shared. *Id.* at 468. (citations omitted). "Absent shared intent, prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion." *Id.* (internal citation and quotation marks omitted).

Consequently, "[t]he mere fact that the parents have consented for the child to move to a new country will not prove that they share the necessary intent to make that new location the child's habitual residence." *Id.* at 467. This is especially so when the move was only intended to be for a specific, limited duration. *Larbie*, 690 F.3d at 310 (quoting *Whiting*, 391 F.3d at 549) (internal quotation marks omitted) (noting that in cases where the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration most courts will find no change in habitual residence). Private reservations about abandoning the prior habitual residence or establishing a new habitual residence are likewise insufficient to negate shared parental intent. *Id.* at 311 (internal citation omitted). Once a family jointly takes steps to abandon the prior habitual residence, one parent's reservations will not negate that objectively manifested shared intent. *Mozes*, 239 F.3d at 1077.

In this case, there is no question that Jaimes and Riascos shared a mutual intent that the United States be K.J.R.'s habitual residence for the first three years of her life. They lived here together as a family with no intention of leaving until Jaimes was faced with immigration difficulties that forced him to leave the country. Tr. 20:16–22:10. The question then is whether

the parties had shared intent for K.J.R. to abandon her habitual residence here and establish a new one in Mexico when she left the United States with her father in October 2012. Riascos urges that they did not because the agreement was for K.J.R. to remain in Mexico only until the age of four. *Id.* at 84:5–8; 110:4–9.  Jaimes disputes this, pointing to the open-ended nature of the written agreements granting him the right to take K.J.R. with him to Mexico in October 2012 and January 2014; the fact that Riascos visited them frequently, including several times right before or soon after K.J.R.'s fourth birthday, during which times they lived together as a family; and the fact that Riascos always returned to America without attempting to take the girl. *Id.* at 22:21–23:4; 29:1–32:20.

In support of her argument that she never intended that K.J.R. abandon her habitual residence of the United States, Riascos states that she did not believe Jaimes's return to Mexico was permanent. *Id.* at 82:14–19.  She instead testified that she was led to believe that she could bring Jaimes back if he left voluntarily. *Id.*  However, whether the parties thought that Jaimes might one day return to the United States does not mean that the United States remained the child's habitual residence. *Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011) (citation omitted) ("[A]n intention or hope to return does not prevent a new residence from being established.") Because parents will often disagree about what their shared intentions were, once litigation is underway, courts must take account of the parents' actions as well as what they say. *Norinder*, 657 F.3d at 534 (citation omitted). In such cases, context, rather than specific periods of time spent in a particular location, is the key to the concept of habitual residence. *Berezowsky*, 765 F.3d at 467. Indeed, when parties argue that their intent was to eventually return rather than to establish a new residence, courts will look to the circumstances of the family's move to assess parental intent. *Id.* at 472. Acts of permanence such as selling cars, belongings, and homes, as

well as the type of belongings brought to the new residence, often indicate the parties' intention to make a permanent move. *Id.* (collecting cases).

Here, the record indicates that K.J.R. and Jaimes's move to Mexico was not temporary. Jaimes signed over his tax refunds and bank accounts in America so that Riascos could access the funds after he left; he signed a voluntary immigration departure form, purchased one-way tickets to Mexico City, obtained a written release from Riascos to take the child, and departed with K.J.R. in tow. Tr. 27:25–28:2; Pet'r's Exs. 3, 4, 5. Soon after, he rented and established a home for the family. Tr. at 28:24–29:2. Although she herself never fully moved to Mexico, up until six months before the abduction Riascos regularly visited K.J.R. and Jaimes for extended periods of time. *Id.* at 29:1–30:4; 31:16–23; 32:2–15; 37:1–15; 84:12–13; 86:7–87:1; 90:10–21. During those visits, the three of them lived together under a single roof as a family. *Id.* K.J.R. never returned to America with her mother after any of her visits. *See id.* 30:25–31:5; 31:24–32:1; 32:16–20; 85:9–17; 87:20–25; 88:6–17; 91:5–19. K.J.R.'s bedroom in Mexico was full of all of her belongings, many of which Respondent brought to her there. *Id.* at 88:18–20. Furthermore, *after* K.J.R.'s fourth birthday, Riascos took steps to purchase the property Jaimes and K.J.R. were living in as an investment because it had another apartment attached that the family could rent out. Resp't's Ex. 1, Title 6, Ch. 1 at 1:53–2:27; 3:25–28. Perhaps most importantly, K.J.R. was also enrolled in school in Mexico, which was slated to begin over a year after her fourth birthday.[5] *See* Pet'r's Ex. 11. The Court is of the opinion that this is sufficient

---

[5] It is also worth noting that Riascos's own testimony undermines her contention that the move was to be temporary. Whether she was aware that K.J.R. was actually enrolled in school by February 2014, Riascos stated that part of the reason she decided to take K.J.R. back to America was because Jaimes had not enrolled her in school yet. (Tr. 92:23–93:7.) Riascos testified that this conversation occurred sometime after the girl's fourth birthday but before the family's trip to Columbia. (*Id.*) This testimony indicates that Riascos acquiesced to (or at least was aware of the possibility of) the girl's enrollment in Mexican school after the age of four.

contextual evidence that the parties had a shared intent that Mexico was to be K.J.R.'s habitual residence. *See Bernal v. Gonzalez*, 923 F. Supp. 2d 907, 916 (W.D. Tex. 2012) (parents' mutual agreement as to habitual residence established by buying land and building a home in Mexico; children's enrollment and attendance in local Mexican schools; Respondent leaving children in Mexico for months at a time while he worked in the United States; and parties' signed agreement); *Mozes*, 239 F.3d at 1078 (citations omitted) (mutual agreement as to habitual residence is established, notwithstanding short time in new residence, when the child moves to a new country accompanied by both parents, who take steps to set up a regular household together).

The Court also finds that the record discredits Riascos's claims that the agreement was for K.J.R. to return to the United States after her fourth birthday. To begin, there are the travel authorizations. *Id.* at 22:21–24:20; 38:1–5; 83:5–18; 90:22–91:19; Pet'r's Ex. 4.  Riascos was aware of Jaimes's immigration woes; nevertheless, when he returned to Mexico indefinitely,[6] she authorized K.J.R. to accompany him. Pet'r's Ex. 4. That travel authorization contained no end date. *See id.* Over a year later, and seven months after K.J.R.'s fourth birthday, Riascos executed yet another agreement authorizing K.J.R. to return to Mexico with Jaimes. Tr. 38:1–5; 90:22–91:19. This agreement also contained no end date. *Id.*  Moreover, Respondent visited Mexico one month before K.J.R.'s fourth birthday, for her fourth birthday, and six months later she met K.J.R. and Jaimes in Colombia, but she did not take the child with her when she returned to the

---

[6] Riascos testified that she did not realize that Jaimes might never be able to come back to the United States. (*Id.* at 82:14–19.) Jaimes disputes this was her understanding. (*Id.* at 77:4–7.) The Court finds that even if Riascos believed Jaimes could someday return, it is much more probable that she was at least aware that there was no set return date on which they could rely at the time of his departure.

United States from Colombia.[7] *Id.* at 31:24–32:20; 37:16–23; 38:1–5; 86:7–24; 87:20–88:17; 90:22–91:19. Given the parties' conflicting testimony as to whether K.J.R.'s stay in Mexico was of finite duration, the Court cannot conclude that the parties reached a shared understanding that the United States was to remain K.J.R.'s habitual residence after she moved to Mexico. *See Mozes*, 239 F.3d at 1081 ("Having heard the conflicting testimony of both parties and reviewed all the evidence, the district court was able to say only that Arnon and Michal had 'discussed the possibility' of extending the stay for one additional year, and that they '*may* have even come to such an understanding.' The district court did not find that they had actually reached such an understanding.") Rather, the record suggests that the parents did in fact "jointly develop the intention" that K.J.R. was to abandon her habitual residence in the United States and establish a new habitual residence in Mexico. *Berezowsky*, 765 F.3d at 468. Jaimes has satisfied the first element of his claim.

### 2. *Existence of rights of custody*

The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5(a). These rights differ from "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence." *Id.* at art. 5(b). "A parent's custody rights need not be enshrined in a formal custody order issued before the removal or retention in order to be actionable; they may instead arise either by agreement or by operation of law." *Madrigal v. Tellez*, EP-15-CV-181-KC, 2015 WL 5174076, at *14 (W.D. Tex. Sept. 2, 2015) (quoting *Larbie*, 690 F.3d at 307) (internal quotation marks omitted); *see also* Convention, art. 3. Thus, a custody order is not a prerequisite to invoking the Convention's

---

[7] The parties do disagree as to whether Riascos asked to take the child back after her July 2013 visit. *Compare id.* at 32:13–20, *with id.* at 87:20–88:17.

return provisions. Department of State Guidance, 51 Fed. Reg. 10494, 10505 (Mar. 26, 1986) ("Children who are wrongfully removed or retained prior to the entry of a custody order are protected by the Convention.").

Because there is no indication that a valid court order or enforceable agreement governed the parties' custodial rights at the time Riascos took K.J.R. from Mexico, Jaimes's "rights of custody arose either by operation of law, or not at all." *Madrigal*, 2015 WL 5174076, at *14 (citation omitted). When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004). Where, as here, the country has more than one territorial unit, the habitual residence refers to the particular territorial unit in which the child was resident, and the applicable laws are those in effect in that territorial unit. Convention, art. 31.

Mexican choice of law rules require that Mexico apply the law of the Mexican State in which the child was habitually resident immediately prior to the child's removal. *Whallon v. Lynn*, 230 F.3d 450, 456 n.6 (1st Cir. 2000). In this case, the applicable law is the Federal District of Mexico City because that is where K.J.R. habitually resided immediately prior to her removal. *See Madrigal*, 2015 WL 5174076, at *14 (citing Convention, art. 3) ("[T]he Court applies the laws of the Federal District of Mexico City because that is where the Children habitually resided immediately prior to their removal."). Pursuant to article 411 of the Civil Code, the Federal District recognizes the doctrine of *patria potestas*. Código Civil para el Distrito Federal art. 411 [CCDF] [Civil Code for the Federal District, art. 411], *available at* http://info4.juridicas.unam.mx/adprojus/leg/10/343/457.htm?s=; *see also Madrigal*, 2015 WL 5174076, at *14 (citations omitted) ("[The] Federal District of Mexico adheres to the doctrine of

*patria potestas*—a generalized concept of parental authority embodied in Mexico's civil code.").

*Patria potestas* is an ancient doctrine with roots in Roman law. *Whallon*, 230 F.3d at 452. The doctrine represents a father's authority over his children. *Gatica v. Martinez*, No. 10-21750-CIV, 2010 WL 6744790, at *5 (S.D. Fla. Oct. 12, 2010). Although it far exceeds modern custody rights in its original form because it embodied something more akin to ownership, over time, the doctrine "survived and evolved into a generalized parental right that now includes such duties as support and affection." *Id.* (citation omitted). Today the doctrine of *patria potestas* applies to both parents and "is understood to mean the relationship of rights and obligations that are held, reciprocally, on the one hand, by the father and mother or in some cases the grandparents and, on the other hand, the minor children who are not emancipated." *Id.* at *6 (quoting *Whallon*, 230 F.3d at 457) (internal quotation marks omitted). *Patria potestas* thus gives both parents certain rights and obligations relating to the physical, mental, moral, and social upbringing of their child. *Madrigal*, 2015 WL 5174076, at *14 (citing *Whallon*, 230 F.3d at 457). *Patria potestas* rights under Mexican law are "rights of custody" under the Hague Convention. *Ortiz v. Cantu*, CIV.A. H-09-2913, 2009 WL 8543610, at *3 (S.D. Tex. Dec. 15, 2009) (citing *Whallon*, 230 F.3d at 459; *Altamiranda Vale v. Avila*, 538 F.3d 581, 587 (7th Cir. 2008)). Consequently, absent a court order abolishing one parent's *patria potestas* rights, both parents have joint custody rights over their minor children. *Castro v. Martinez*, 872 F. Supp. 2d 546, 555 (W.D. Tex. 2012) (citation omitted). Jaimes has satisfied the second element of his claim.

### 3. *Exercise of rights of custody*

Under Article 13(a), a court does not have to order the return of a wrongfully removed child if the non-removing party was not "exercising" his custody rights at the time of removal. Because Article 13(a) does not define "exercising," courts have looked to the Convention's

underlying purposes for guidance in applying this exception. *Rodriguez v. Yanez*, 817 F.3d 466, 472 (5th Cir. 2016). American courts interpret "exercise" broadly. *Sealed Appellant*, 394 F.3d at 344 (citations omitted). Thus, "in the absence of a ruling from a court in the country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights." *Id.* at 345. "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Id*.

Here, because K.J.R. had been living with Jaimes for almost two years, the Court easily concludes that Jaimes was exercising his custody rights at the time of the removal. Whether he was exercising these rights poorly, as Riascos asserts, is not a question for this Court. *See Yanez*, 817 F.3d at 473 (internal citation and quotation marks omitted) ("Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly.") That question goes to the merits of the custody dispute and is, therefore, beyond the subject matter jurisdiction of this Court. *Id.* (internal citation and quotation marks omitted).

**B. Respondent's defenses**

Because Jaimes has established his prima facie case, the child must be returned unless Riascos can establish that one of the Convention's affirmative defenses applies. Convention, art. 13; 22 U.S.C. § 9003(e)(2); *Munoz v. Ortega*, No. 7:13-cv-557, 2014 WL 10319681, at *2 (S.D. Tex. Aug. 6, 2014) (citation omitted). Of the Convention's available defenses, only one is at issue in this case, 13(b)'s grave risk of physical or psychological harm or intolerable living situation. In order to succeed, Riascos has the burden of proving this defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). However, even if a court makes an affirmative

finding of grave risk or intolerable situation, it does not mandate that the child not be returned. *Loftis*, 67 F. Supp. 3d at 809. A court possesses the discretion to order the return of the child "if return would further the aims of the Convention." *England*, 234 F.3d at 271 (internal citation and quotation marks omitted).

Because, "a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes," courts consistently hold that Article 13(b) must be narrowly construed. *Loftis*, 67 F. Supp. 3d at 809 (citing *England*, 234 F.3d at 271). The threshold for grave risk of harm is thus very high. *Bernal*, 923 F. Supp. 2d at 920. The respondent "must demonstrate 'that the risk to the child is grave, not merely serious.' " *Id.* (quoting Convention Analysis, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986)). Accordingly, courts generally recognize only two types of grave risk or intolerable situations under Article 13(b): sending a child to a zone of war, famine, or disease; or cases of serious abuse or neglect. *Loftis*, 67 F. Supp. 3d at 809 (citation omitted).

### 1. *Jaimes's alleged abuse and criminal activity*

In support of her 13(b) defense, Riascos first argues that Jaimes's abuse of her and K.J.R. places the child in grave risk or intolerable situation. (Tr. 12:24–25.) Respondent also alleges that Jaimes's 2009 charge for conspiracy to distribute illegal drugs and his suspected "criminal activity in Mexico" indicates grave risk. (*Id.* at 13:4–13.)

Under 13(b), spousal abuse is only relevant if it seriously endangers the child. *Souratgar v. Lee*, 720 F.3d 96, 103–04 (2d Cir. 2013). Thus, where the petitioner demonstrates a sustained pattern of physical abuse or propensity for violence, especially if the child observed such abuse, courts have found that there is a grave risk to the child. *Id.* (internal citation and quotation marks omitted) (collecting cases); *Simcox v. Simcox*, 511 F.3d 594, 605 (6th Cir. 2007) (collecting

cases). In contrast, "sporadic and isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found not to constitute a grave risk." *Souratgar*, 720 F.3d at 104 (collecting cases); *see also McManus v. McManus*, 354 F. Supp. 2d 62, 70 (D. Mass. 2005) (two incidents of physical or violent discipline and general testimony that Petitioner struck or threw objects at children insufficient). Isolated allegations of child abuse are even more suspect when disputed by the parties. *Altamiranda Vale*, 538 F.3d at 587 (contested assertion that Vale once struck his son with a video-game cord fell short of meeting the "demanding burden" of establishing grave harm).

Although the parties disagree whether Jaimes physically abused Riascos, the 2011 incident in which Jaimes was arrested for domestic violence lends some credence to Riascos's allegations. However, there is no evidence that K.J.R. was targeted or at risk during this incident, or that she even observed it.[8] The Safety Assessment filled out after the incident states that it is used to evaluate whether a child is "in immediate danger of serious harm." (Resp't's Ex. 2.) The only safety factor that is marked affirmatively on this form states that "domestic violence [is] likely to have a negative impact on the child." (*Id.*) The form goes on to respond in the negative to the following questions: "Caregiver caused serious physical harm to the child or has made a plausible threat to cause serious harm"; "Caregiver is unwilling, or is unable, to meet the child's immediate needs for food, clothing, shelter, and/or medical or mental care"; "Child is fearful of caregiver"; and "Child sexual abuse is suspected and circumstances suggest that child safety may be an immediate concern." (*Id.*)

The only other allegation of abuse arises from Riascos's testimony that on the night of

---

[8] Jaimes testified that K.J.R. did not witness the assault. (*Id.* at 66:11–13.) Riascos does not mention the assault in detail.

K.J.R.'s removal from Mexico Jaimes physically and verbally assaulted Riascos and threw K.J.R. on the bed. (Tr. 94:2–95:18.) Jaimes denies these allegations. (*See id.* at 50:15–52:16.) Without more, Riascos's speculation and the parties' conflicting testimony are insufficient to meet the high threshold for a grave harm defense. *Edoho v. Edoho*, CIV.A. H-10-1881, 2010 WL 3257480, at *6 (S.D. Tex. Aug. 17, 2010) (finding that respondent failed to meet burden on grave risk defense when there was conflicting testimony regarding abuse of the child); *San Martin v. Moquillaza*, 4:14-CV-446, 2014 WL 3924646, at *6 (E.D. Tex. Aug. 8, 2014) (same); *Norinder*, 657 F.3d at 535 (same).

Finally, the exceptions to return are prospective, not retrospective. *Sanchez v. R.G.L.*, 761 F.3d 495, 509 (5th Cir. 2014). As a result, past acts of domestic abuse or drug activity in the home are insufficient to show grave risk of harm. *Sanchez v. Sanchez*, SA-12-CA-568-XR, 2012 WL 5373461, at *11 (W.D. Tex. Oct. 30, 2012), *vacated on other grounds sub nom. R.G.L.*, 761 F.3d 495. Similarly, when the child observed parental abuse in the past, if the parents' current living situation makes it unlikely that the child will do so again, there is no grave risk of harm. *See Souratgar v. Fair*, 12 CIV. 7797 PKC, 2012 WL 6700214, at *11 (S.D.N.Y. Dec. 26, 2012), *aff'd sub nom. Souratgar*, 720 F.3d 96 (noting that the fact that parents will never cohabitate again and there is no credible evidence that the child would have a negative reaction to being returned weighs against a finding of grave risk of harm based on the child's past observation of one parent abusing the other). Thus, even were the Court to find Riascos's allegations credible, such isolated, remote incidents are insufficient to demonstrate grave risk of harm. Jaimes's 2009 conspiracy charge is over seven years old. (Tr. 68:5–69:15.) The 2011 domestic disturbance is nearly five years old and occurred when the parties cohabitated. (*Id.* at 65:11–14.) There is no indication that the same conditions will exist if K.J.R. is returned to Jaimes. Consequently,

neither the allegations of abuse or criminal activity support Riascos's grave risk of harm defense.

       **2.  *High crime in Mexico City***

Riascos next argues that K.J.R. will be in grave danger if she is returned because Jaimes lives in one of the highest crime areas of the city. (*Id.* at 13:13–16.) Jaimes disputes this characterization of his neighborhood and testified that Riascos was aware of what kind of neighborhood he and K.J.R. lived in when she left the child in his custody after Riascos's first trip to Mexico. (*Id.* at 59:24–60:5.)

Because of the high threshold of 13(b), courts have routinely found that the exception "was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited . . . ." *Loftis*, 67 F. Supp. 3d at 809 (internal citation and quotation marks omitted). Nor are living conditions marked by poverty, sociopolitical unrest, or community violence sufficient to show grave risk of harm or intolerable situation. *Vazquez*, 2011 WL 196164, at *5 (evidence that community where Petitioner lives is dangerous due to surge in cartel activity is not sufficient to establish that it is "zone of war"); *Silverman v. Silverman*, 338 F.3d 886, 901 (8th Cir. 2003) (general regional violence in Israel does not establish a "zone of war"); *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1365–66 (civil instability and presence of violent demonstrations in Argentina does not amount to a "grave risk" or "intolerable situation"); *Bernal*, 923 F. Supp. 2d at 921 (evidence that ongoing cartel violence in Mexico posed serious risk to children insufficient to amount to "grave risk" or show that petitioner's community was "zone of war, famine, or disease"). Moreover, at least one court has concluded that a respondent undercuts her claims of grave risk when the evidence demonstrates that she voluntarily left the child with the petitioner for extended periods of time only to later claim that the conditions there place the child at grave risk. *See Alonzo v.*

*Claudino*, 106CV00800, 2007 WL 475340, at *5 (M.D.N.C. Feb. 9, 2007) ("It cannot be found that the general living conditions in Honduras either pose a grave risk of harm or create an intolerable situation considering the fact that Ms. Pineda voluntarily left Maria Jose in Honduras when she came to the United States for an extended period of time.")

In light of these cases, Riascos's general allegations of high crime in Mexico City are insufficient to establish her grave risk of harm defense. Moreover, after three visits to Jaimes's residence, some for extended periods of time, Riascos was no doubt aware of the safety (or danger) of the neighborhood. It is difficult to give any credence to her allegations of concern for grave risk when she left the child in Jaimes's care for nearly two years, in the same neighborhood that she now criticizes for its high crime rate.

### 3. *K.J.R.'s physical and mental state*

Finally, Riascos contends that K.J.R.'s physical and mental state when she removed the girl from Mexico supports her defense. (Tr. 13:23–14:12.) She testified that K.J.R. was in a "very bad" condition when Riascos saw her in July 2014. (*Id.* at 101:7–9.) According to Riascos, K.J.R. was underweight, covered in lice, and had severe dental problems that required "a molar" to be pulled. (*Id.* at 101:9–102:7.) She also testified that when K.J.R. started school she was sent home because of her poor physical condition and Riascos subsequently sought medical treatment for the girl's physical and psychological problems. (*Id.* at 112: 3–114:15.)

Here, the Court finds that Riascos's claims that Jaimes neglected the child are not corroborated by the record. First, according to K.J.R.'s state insurance and medical documents, in February 2014, when K.J.R. was enrolled in school, her body condition was "normal" and she was fully vaccinated. (Pet'r's Exs. 1, 11.) Although the Court recognizes that a child's health can change rapidly, pictures of K.J.R. as late as February/March 2014 show a healthy, vibrant young

girl. (*See* Pet'r's Exs. 13, 16–20, 22–27, 29–31, 33–37.) Moreover, Riascos's allegations that K.J.R. had urgent issues with her teeth is undermined by her dental records, which show that an initial visit was scheduled on November 2014, four months after her removal from Mexico, but then rescheduled to February 2015. Tr. 112:23–113: 21; Resp't's Ex. 7. Indeed, the girl did not even see a dentist until seven months after her arrival in the United States. Resp't's Ex. 7. Furthermore, despite counsel's efforts to obtain such documentation, there are no school records indicating K.J.R. was sent home for medical issues and no medical records showing that she received care for any urgent physical or psychological issues after her arrival. *See* Tr. 112:7–24.

The testimony presented by Riascos and disputed by Jaimes is simply not enough to establish by clear and convincing evidence that the child would be in grave risk of physical or psychological harm if returned to Mexico. *See San Martin*, 2014 WL 3924646, at *6 (conflicting testimony of parties as to existence of grave harm insufficient to establish 13(b) defense); *Norinder*, 657 F.3d at 535 (allegations of grave harm based "on a handful of serious fights the couple had; an incident in which Fuentes contends that Norinder threw [the child] on the ground during an argument; allegations that Norinder is addicted to prescription drugs and that he abuses alcohol; and the testimony of two psychiatrists . . . who appeared on Fuentes's behalf" insufficient to establish grave harm). Essentially, the parties here dispute whether Jaimes is a fit parent. However, the grave risk of harm defense was not intended to be used by a respondent as a vehicle to litigate the child's best interests. Convention Analysis, 51 Fed. Reg. at 10510. Any debate regarding whether Riascos is more fit to be the primary caretaker of K.J.R. must take place in the United Mexican States, not in this Court. *See Bernal*, 923 F. Supp. 2d at 922–23 (questions about who is superior caregiver must be litigated in courts of habitual residence).

## I.     Conclusion

For the reasons stated above, the Court finds that Jaimes has met his burden to show by a preponderance of the evidence that his daughter, K.J.R., was wrongfully removed from Mexico by Riascos. Riascos has not met her burden to establish that any exceptions apply to the wrongful removal. Accordingly, the Court hereby

**ORDERS**, pursuant to the Convention and ICARA, that K.J.R. is ordered into the custody of the United States Marshal's Service to be delivered into the company of Imanol De La Flor Patino, Consul of Mexico, or his appointed agent(s), to be returned to the sovereign nation of the United Mexican States and that Jose Primitivo Jaimes Sierra report the delivery of the minor child to the appropriate Central Authority.

By virtue of this Order, Imanol De La Flor Patino, or his appointed agent(s), has the exclusive right to the custody of K.J.R. for the limited purpose of returning her to her habitual residence with her father, Jose Primitivo Jaimes Sierra in the United Mexican States.

This Order is not a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention.

The Order of this Court is made under the authority of 22 U.S.C. § 9001(a), conferring original jurisdiction upon this Court, and Article 18 of the Convention.

This Order is effective as of the date written below, and shall continue in force and effect until modified or cancelled by this Court.

**THEREFORE, TO ANY PEACE OFFICER IN THE STATE OF TEXAS OR TO ANY FEDERAL OFFICER:**

You are hereby commanded to assist, Imanol De La Flor Patino, Consul of Mexico, or his appointed agent(s), to remove the minor child from the United States of America, and to allow a

representative of the Mexican Consulate to accompany the minor child to Mexico, giving Imanol De La Flor Patino, Consul of Mexico, or his appointed agent(s), the right without interference to have the minor child in lawful temporary custody for the purposes described herein.

SIGNED at Houston, Texas, this 28th day of September, 2016.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE